## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM BLASI,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 10-6814** |
| | : | |
| **PEN ARGYL AREA** | : | |
| **SCHOOL DISTRICT,** | : | |
| **Defendant** | : | |

### M E M O R A N D U M

**STENGEL, J.**                                    **September  30, 2011**

William Blasi, *pro se*, filed this action against his children's public school district under 42 U.S.C. § 1983, alleging a violation of his First Amendment right to free expression, his right to petition the government for redress, and his right to be free from retaliation for exercising his constitutional rights.

The defendant has filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the following reasons, I will grant the motion in its entirety.

### I.     BACKGROUND[1]

William Blasi is the father of two children, Oliver and Pierce, whom the amended complaint describes as being of mixed race, i.e., "part white and part ethnic Chinese."  See Am.Compl. ¶ 3.  In November 2009, both of these children

---

[1] The facts are gleaned from the amended complaint and the extrinsic documents upon which it is based.  See GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004).  For the purposes of this motion, they are presented in the light most favorable to the plaintiff, as the non-moving party, and are accepted as true with all reasonable inferences drawn in his favor.

made the defendant's 7th and 8th grade basketball teams, respectively, along with every other student who tried out.  Id. ¶ 4.

The amended complaint alleges that the plaintiff's two sons were subsequently discriminated against and harassed due to their race and/or due to the plaintiff complaining that the Wind Gap Area Athletic Association, the defendant's feeder program, had discriminated against them.  Id.  Mr. Blasi also alleges that the defendant's coaches encouraged assaults on his children by other children who "were mainly white," and denied his sons equal opportunity to play basketball because "lesser skilled white boys" and "much lesser skilled white boys" played more than his sons.  Id.

Mr. Blasi complained on numerous occasions to the defendant about the fact that his sons were fouled while playing basketball.  Id. ¶ 5.  From November 12, 2009 until December 23, 2009, the plaintiff sent seventeen emails to various officials and coaches of the defendant, where he complained about how the program was run, players being encouraged to foul excessively, the Blasi children being excessively fouled, and the discrimination of the coaches and their favoritism toward white student players.  Id.

On December 22, 2009, Terry R. Barry, the principal of the Blasi children's Middle School, sent a letter to Mr. Blasi to inform him that he was prohibited from attending one home basketball game for violating the School District's policy, i.e., several provisions of the August 2005 Parental/Spectator Guidelines.  Id. ¶ 7.  Mr. Barry wrote:

> It has come to my attention from our Middle School
> Basketball Coaches and our Athletic Director that you
> have recently sent scathing and threatening emails in
> which you berate and harass our coaches and make
> degrading and deplorable comments about 7th and 8th
> grade players in a most undignified manner, the likes of
> which I have never seen.  This conduct, as you know, is
> a violation of the Parental/Spectator Guidelines (see
> enclosure) which was given to you at a parent meeting
> prior to the start of the 09-10 season and which you and
> your children signed on 11-19-09, acknowledging
> receipt of said Guidelines.  . . .
>
> As for our players (your sons' teammates!), your emails
> take on an even more disgusting and inappropriate tone
> in that you refer to Avery, LaBar, Hannah,
> Meserschmidt, Freda, Valleta, Flick, Alabanese,
> Pitchford, and Young as "suck players," "scrubs," "not
> even players," "should not be on the team," "unskilled,"
> "un-coachable," "obese," "out of shape," and "laughing
> stock."

See Am.Compl. Exh. A.  The letter made clear that further criticism of the coaches

and players would not be tolerated by the defendant.  See Am.Compl. ¶ 7A.  Mr.

Barry also warned that further violations of the parental rules would lead to a total

ban of the plaintiff from future games.  Id.  Mr. Blasi was subsequently not

permitted to attend the middle school basketball game on January 8, 2010.  Id. ¶ 8.

Mr. Barry indicated that any attempt by Mr. Blasi to attend that game would

constitute trespassing.  See Am.Compl. Exh. A.

## II.    STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure examines the legal sufficiency of a complaint.  Conley v. Gibson, 355

U.S. 41, 45-46 (1957).  The factual allegations must be sufficient to make the

claim for relief more than just speculative.  Bell Atlantic Corp. v. Twombly, 550

U.S. 544, 555 (2007).  In determining whether to grant a motion to dismiss, a

federal court must construe the complaint liberally, accept all factual allegations in

the complaint as true, and draw all reasonable inferences in favor of the plaintiff.

Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir.

1984).

      The Federal Rules of Civil Procedure do not require a plaintiff to plead in

detail all of the facts upon which he bases his claim.  Conley, 355 U.S. at 47.

Rather, the Rules require a "short and plain statement" of the claim that will give

the defendant fair notice of the plaintiff's claim and the grounds upon which it

rests.  Id.  The "complaint must allege facts suggestive of [the proscribed]

conduct."  Twombly, 550 U.S. at 564.  Neither "bald assertions" nor "vague and

conclusory allegations" are accepted as true.  See Morse v. Lower Merion School

Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern Pennsylvania

Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995).  A complaint, however,  "must

satisfy . . . the simple requirements of Rule 8(a)."  Swierkiewicz v. Sorema N.A.,

534 U.S. 506, 513 (2002).  Following the Supreme Court's decision in Twombly,

Rule 8(a) now requires that the facts in a complaint plausibly suggest that the

pleader is entitled to relief.  Accordingly, to state a claim, a plaintiff must state

enough factual matter, taken as true, to suggest the required element, which does

not impose a probability requirement at the pleading stage, but instead simply calls

for enough facts to raise a reasonable expectation that discovery will reveal

evidence of the necessary element.  <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 234 (3d Cir. 2008).

## III.   DISCUSSION

After filing a motion for a temporary restraining Order and receiving the defendant's response,[2] Mr. Blasi filed a six-count amended complaint.  Although trained as an attorney, Mr. Blasi filed this pleading *pro se.*  The obligation to liberally construe a *pro se* litigant's pleadings is well-established.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520-521 (1972).  However, a *pro se* plaintiff is not excused from the duty to prove a "set of facts in support of his claim which would entitle him to relief."  <u>Id.</u>  With that in mind, I will assume that all of the counts in this amended complaint are brought under § 1983 because each count asserts alleged violations of the Constitution.

In Count 1, Mr. Blasi claims that he was retaliated against by the defendant for exercising his First Amendment[3] rights.  He seeks a declaratory judgment declaring that his sanction, i.e., suspension from the home game, was unconstitutional.  He characterizes the defendant's action against him as "viewpoint discrimination."  In Count 2, Mr. Blasi seeks a declaration that the 2010 Guidelines and the Athletic Code are unconstitutional because they prohibit

---

[2] On February 28, 2011, after a hearing, I denied Mr. Blasi's motion for a temporary restraining Order.  <u>See</u> Document #16.

[3] The First Amendment to the United States Constitution provides:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

any inappropriate/antagonistic manner of confronting the coaching staff.  In Count 3, Mr. Blasi alleges that forcing his boys to wear an "off-the-court" uniform violates his First Amendment right to raise his family.  Count 4 seeks to stop the district's policy of a "closed gym" or a "closed practice," which prohibits parents or spectators from watching.  This policy, Mr. Blasi argues, serves to hide the incompetence of coaches and their abusive conduct.  In Count 5, Mr. Blasi wants the defendant prohibited from holding closed tryouts for the boys' tennis team; and prohibiting the tryouts at all unless he is allowed to videotape the tryouts and the practices.  And finally, in Count 6, Mr. Blasi asks for a declaration that the separate one-game suspensions of his two sons were unconstitutional.  Mr. Blasi says these suspensions are violative of his First Amendment rights.  I note that the Blasi children are not plaintiffs in this case.

## A.  Section 1983 Claims

Under 42 U.S.C. § 1983, a private party may recover in an action against any person acting under the color of state law who deprives the party of his or her constitutional rights.[4]  Therefore, in order to succeed on a claim under 42 U.S.C. §

---

[4]  Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

1983, a plaintiff must demonstrate: (1) the violation of a right secured by the Constitution, and (2) that the deprivation was committed by a person acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  Section 1983 does not by itself confer substantive rights, but instead provides a remedy for redress when a constitutionally protected right has been violated.  Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985).  To determine if a person was acting under the color of state law, the court must ask whether the plaintiff's deprivation was "caused by the exercise of some right or privilege created by the State" and whether the defendant "may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).

       1.  Count 2 – Parental/Spectator Guidelines and the Athletic Code

In Count 2, Mr. Blasi challenges as unconstitutional the School District's Parental/Spectator Guidelines, a two-page document directed at parents and spectators who are physically present at an athletic event.  The document contains a list of "Do's" and "Do Not's," with three explicit sanctions listed for violations, the most grievous being a one-year suspension from attending any home school district athletic event.  See Am.Compl. Exh. B.  The Guidelines indicate that "the use of impersonal, electronic, handwritten means of expressing concerns is not an acceptable substitute for effective, cooperative, face-to-face communications." Further, the Guidelines prohibit the criticism of coaches, staff, and student players *at basketball games and practices*.  Instead, the Guidelines suggest making arrangements to speak with coaches at an appropriate time and place.  And, they

encourage the parents and spectators to conduct themselves in a positive and supportive way towards the coaching staff and all of the student players, regardless of athletic ability.

Mr. Blasi insists that rules prohibiting criticizing the incompetence of coaches; criticizing coaching that endangers the health, safety, and lives of children; and pointing out the discrimination of the coaching staff against his mixed-race children violates the United States Constitution.  He further insists that the rules prohibiting the "inappropriate/antagonistic manner" of confronting coaches are "unconstitutional as the description is vague and overbroad, and can be stretched to encompass criticism of the [defendant's] racial preference for white players and can be stretched to encompass criticism of coaches and coach decisions."  See Am.Compl. ¶ 14.  The rule banning emails or written mail, he contends, "clearly violates the U.S. Constitution as such ban could never be considered a reasonable time, place, or manner ban."  Id.

In assessing the constitutionality of regulations that place burdens on speech, the Supreme Court of the United States has given us various tests to employ.  For example, when a regulation is aimed at suppressing the content of protected speech, the "strict scrutiny" test applies.  Turner v. Broadcasting System, Inc. v. FCC, 512 U.S. 622, 642 (1994).  Under this test, a restriction must serve a compelling state interest and be narrowly tailored to achieve that interest by the least restrictive means possible.  Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221 (1987).

Where a regulation does not seek to regulate the content of speech itself, but instead seeks to curb the undesirable secondary effects of speech by prescribing the time, place, and manner of it, the "intermediate scrutiny" test applies.  Ben Rich Trading v. City of Vineland, 126 F.3d 155, 160 (3d Cir. 1997). Here, because the Guidelines do not seek to regulate the content of speech itself, the intermediate scrutiny test applies.

Under the intermediate scrutiny test, "time, place, manner" regulations of protected speech are valid if:  (1) they are justified without reference to the content of the regulated speech; (2) they are narrowly tailored to serve a significant or substantial government interest; and (3) they leave open ample alternative channels for communication.  Id.; see also Turner Broadcasting, 512 U.S. at 642 (a regulation is valid if it is content-neutral, is narrowly tailored to serve a substantial interest, and leaves alternative avenues of speech open to the speaker).

In Rottman v. Pennsylvania Interscholastic Athletic Association, Inc., 349 F. Supp.2d 922 (W.D. Pa. 2004), a high school coach brought a § 1983 action challenging the constitutionality of the state athletic association's anti-recruiting rule.  That rule prescribed the manner and circumstances in which a coach could talk to potential recruits.  The plaintiff argued that her First Amendment rights were violated because the rule was a "complete ban on coach/prospective student speech."  The court applied the intermediate scrutiny test and stated:

> The Anti-Recruiting Rule passes constitutional muster under the intermediate scrutiny test.  We find from the credible evidence that it serves the substantial

> government interests of prioritizing academics over
> athletics, protecting young student athletes from
> exploitation, and ensuring an even playing field among
> competing schools. The Rule is narrowly drawn to
> serve those interests: it proscribes only recruiting of
> students, in whole or part, for athletic purposes.
>
> Finally, the Rule allows alternative avenues of
> communication regarding the North Catholic athletic
> programs. The Rule does not prevent plaintiff from
> talking about her basketball program, rather it
> proscribes the manner and circumstances in which she
> may do so…

Id. at 931.  Here, the same analysis applies.  Mr. Blasi alleges that the 2010

Guidelines are unconstitutional, although he conceded that the 2005 Guidelines

"were clearly drafted as reasonable time, place, and manner regulation of speech."

See Am.Compl. ¶ 9.  The only difference between the two editions is the addition

of the following sentence in the 2010 edition:  "The use of impersonal, electronic,

handwritten means of expressing concerns is not an acceptable substitute for

effective, cooperative, face-to-face communications."  Thus, the 2010 version of

the Guidelines does not seek to regulate the content of Mr. Blasi's speech, or the

content of anyone else's speech.  Instead, it prescribes the manner and

circumstances in which a parent or spectator could talk to a member of the

coaching staff.

Furthermore, the Guidelines reflect a substantial government interest in

protecting young students from witnessing heated confrontations between a parent

and a coach, or from hearing parents and spectators rant about a coach's alleged

incompetence.  The good experience of the other student athletes in the game

should not be disrupted by parents or spectators who strongly disagree with a coach's decisions or the way he coaches the team.  Behavior like Mr. Blasi's only serves to harass and disrupt the functioning of the entire basketball program to the detriment of all participants.

Finally, the Guidelines allow alternative avenues of communication.  They allow for a parent or spectator to say whatever he or she desires to the coaches including criticism "at an appropriate time and place," and emphasize when and where inappropriate and/or antagonistic comments should be made.  I also note that the Guidelines do not necessarily ban email and written correspondence with coaches.  Rather, they advise that emails and letters are "not an acceptable substitute" for face-to-face conversations.  The Guidelines instruct that a parent should seek a mutually convenient time to discuss his or her complaints with the coaches.  Nothing in the Guidelines prevents Mr. Blasi from seeking personal interaction or even using the telephone to speak his mind and voice his concerns with the coaches, even if done so in an antagonistic fashion.

Accordingly, I find that the 2010 version of the Parent/Spectator Guidelines are content-neutral; they are narrowly tailored to serve a substantial interest; and they leave alternative avenues of speech to the speaker.

Mr. Blasi also questions the constitutionality of the School District's Athletic Code, an eight-page document which is directed toward the student athlete, and explains the School District's policies governing interscholastic sports, including, *inter alia*, the student's eligibility to play, his or her commitment

to the team, the code of sportsmanship, the athlete's conduct, and the School

District's drug/alcohol policy.  See Am.Compl. Exh. B.  Mr. Blasi does not

specify, however, which section of the Athletic Code is troublesome to him.  One

section of the Athletic Code, entitled "Coach/Athlete/Parental Relations," contains

a prohibition on unsportsmanlike behavior similar to the one in the Guidelines:

> Differences in philosophy, concerns regarding playing
> time, etc., between players/parents and coaches
> should be addressed somewhere other than at the site
> of a practice or game competition. Such differences
> should be dealt with on a calm, rational level and in
> the presence of the Principal and/or Athletic Director,
> with an emphasis on the steps which must be taken by
> the athlete in order to improve his/her position on the
> team.

See Am.Compl. Exh. B at 6.  I will assume that this is the paragraph that is

objectionable to Mr. Blasi because the Athletic Code contains no other language

directly applicable to parents, and places no other burdens on speech.

The same constitutional analysis applies to the Athletic Code, i.e., the

intermediate scrutiny test.  The Athletic Code's only section which places a slight

burden on parents does so by instructing that parents should address their concerns

about the coaching staff or the program somewhere other than at the site of the

practice or game.  This restriction is content-neutral and emphasizes the need of all

involved to ensure the best experience possible for the student athlete.  Nothing in

the Athletic Code prevents Mr. Blasi or any other parent from speaking freely to

the coaches as long as it is done away from the site in order to shield student

athletes from anything that would detract from their participation in interscholastic sports.

Further, I do not agree with the plaintiff that the Guidelines and the Code are unconstitutionally vague.  In general, a school district policy can be found unconstitutionally vague if it fails to establish standards to guard against arbitrary enforcement.  Sypniewski v. Warren Hills Regional Bd. of Educ., 307 F.3d 243 (3d Cir. 2002).  A policy can be void for vagueness by either (1) failing to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits, or (2) by authorizing and even encouraging arbitrary and discriminatory enforcement.  City of Chicago v. Morales, 527 U.S. 41, 56 (1999); see also Sypniewski, 307 F.3d at 266.  The vagueness doctrine aims to ensure against arbitrary enforcement.  Morales, 527 U.S. at 56.  When addressing school disciplinary rules, courts have been less demanding of specificity than they have of criminal statutes.  School disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.  Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 686 (1986).  A school rule will only be struck down when its vagueness is especially problematic.  Sypniewski, 307 F.3d at 266.

Here, the plaintiff has failed to demonstrate that the Guidelines and the Code are void for vagueness.  These rules and policies define what is acceptable behavior for both the parents and the student athletes at sporting events, and provide more than sufficient notice of the consequences of violating the rules. School districts must have the authority to control a wide range of disruptive

behavior on their premises, and are not required to provide detailed specificity or definitions in its policies.  Moreover, the Guidelines apply to any "parent/spectator present at an athletic event," and the Athletic Code applies to all student athletes who are eligible to participate in the School District's interscholastic sports programs.  Thus, these regulations apply equally to all involved in the athletic programs of the School District and in no way promote discriminatory treatment of parents, student athletes, or spectators.

Likewise, these policies cannot be considered unconstitutionally overbroad. A school district policy can be found unconstitutionally overbroad if there is a likelihood that the policy's very existence will inhibit free expression by inhibiting the speech of third parties who are not before the court.  Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 799 (1984); Saxe v. State College Area School District, 240 F.3d 200, 214 (3d Cir. 2001).  A policy can be struck down only if no reasonable limiting construction is available that would render the policy constitutional.  Sypniewski, 307 F.3d at 559.  This analysis is not casually employed by courts to strike down policies that have any effect on the First Amendment.  Los Angeles Police Dept. v. United Reporting Publ'g Chp., 528 U.S. 32, 39 (1999) (because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, the courts have employed it as only a last resort).  In the context of schools, numerous courts have recognized that speech that disrupts education, causes disorder, or inappropriately interferes with others' rights may be regulated.

Saxe, 240 F.3d at 215; Sypniewski, 307 F.3d at 259; Tinker v. Des Moines

Independent Community School District, 393 U.S. 503, 513 (1969).

Here, these policies in question place no inhibition on free expression.

Rather, they indicate that a parent or spectator should not:

> confront coaches in an inappropriate/antagonistic
> manner before, during, or after games/practices.
> Instead, make arrangements to speak with coaches at
> an appropriate time and place. (The use of impersonal,
> electronic, handwritten means of expressing concerns
> is not an acceptable substitute for effective,
> cooperative, face-to-face communication).

See Am.Compl. Exh. B at 1.  Accordingly, the policies still permit any individual

expression of dissatisfaction with the coaches.  They merely serve to act as a

reasonable restriction on when parents or spectators should express their concerns

with coaches in order to avoid disruptions and interfere with the rights of others,

and as such, are not overbroad.

Accordingly, I find that the plaintiff has failed to demonstrate that either the

School District's Parental/Spectator Guidelines or the Athletic Code are

unconstitutional.  I will grant the defendant's motion to dismiss Count 2.

### 2.  Count 1 – Retaliation for Exercising First Amendment Rights

In Count I of the amended complaint, Mr. Blasi brings a claim pursuant to

42 U.S.C. § 1983 for retaliation for exercising his First Amendment rights.  He

characterizes Mr. Barry's letter dated December 22, 2009 as an unconstitutional

attempt by the defendant to proscribe written complaints about the defendant's

coaches and their decisions.

"To plead a retaliation claim under the First Amendment, a plaintiff must allege (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Emigh v. Steffee, 2011 U.S. App. LEXIS 15965, 12-13 (3d Cir. Aug. 2, 2011) (quoting Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006)).

A careful review of Mr. Barry's letter reveals that there was no retaliatory action in suspending Mr. Blasi from attending one basketball game. The letter carefully sets forth Mr. Blasi's specific violations of the Parental/Spectator Guidelines, citing the exact provision violated, and describing his unacceptable behavior. It explains the sanction given as provided in the Guidelines. Mr. Blasi indicated by his signature that he had received and read a copy of the Guidelines, and he agreed to uphold the standards therein for the 2009-2010 school year. See Am.Compl. Exh. A. Mr. Blasi has not demonstrated that the School District's Parental/Spectator Guidelines are unconstitutional. The School District was well within its rights to impose the sanction it did. In fact, the suspension should not have come as a surprise to Mr. Blasi, having been put on notice upon receipt of the Guidelines in November 2009.

Mr. Blasi also hints at a violation of his First Amendment right to petition the government for redress of grievances. "The Due Process Clause of the Fourteenth Amendment imposes upon state actors an obligation to refrain from preventing individuals from obtaining access to the civil courts," and government

16

agencies.[5]  <u>Brown v. Grabowski</u>, 922 F.2d 1097, 1113 (3d Cir. 1990).  To state a

claim for violation of the First Amendment right to petition for redress, a plaintiff

must "demonstrate that a defendant caused actual injury ' . . . i.e., took or was

responsible for actions that hindered [a plaintiff's] efforts to pursue a legal

claim.'"  <u>Roberts v. Mentzer</u>, 382 Fed. App'x 158, 162 (3d Cir. 2010) (quoting

<u>Beckerman v. Susquehanna Twp. Police & Admin.</u>, 254 Fed.Appx. 149, 153 (3d

Cir. 2007)).

  It is unclear how Mr. Blasi believes that the defendant interfered with his

right to access the courts or any government agency.  Cases alleging denial of

access generally relate to one of two categories.  <u>Christopher v. Harbury</u>, 536 U.S.

403, 412-413 (2002).  The first category of claims alleges "systemic official action

frustrates a plaintiff or plaintiff class in preparing and filing suits at the present

time."  <u>Id.</u> at 413.  Examples include cases in which the relief sought was access to

a law library, a reader for an illiterate prisoner, or access to a lawyer.  <u>Id.</u>  The

second category of claims alleges the defendant "has caused the loss or inadequate

settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an

opportunity to seek some particular order of relief . . . ."  <u>Id.</u>  There is no allegation

in the amended complaint or any set of facts with which to construe such a

---

[5]  The Supreme Court has noted decisions addressing the right of access to the courts
have been grounded in the Article IV Privileges and Immunities Clause, the First
Amendment Petition Clause, the Fifth Amendment Due Process Clause, the Fourteenth
Amendment Equal Protection Clause, and the Fourteenth Amendment Due Process
Clause.  <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 n.12 (2002).

violation.  Mr. Blasi does not allege that any action of the defendant frustrated his attempts at preparing and filing an action of any kind, or thwarted his attempt to seek relief.  At all times during his children's participation on the basketball team, Mr. Blasi remained free to petition for relief from any of the defendant's officials and any state or federal court.  In fact, the amended complaint indicates that Mr. Blasi had also filed claims on behalf of his children against the School District with the United States Department of Education, see Am.Compl. ¶ 4, with the Pennsylvania Department of Education, id. at ¶ 6, and with the Pennsylvania Interscholastic Athletic Association, id.  I must conclude that any reference to the denial of a right to petition for redress is a bald assertion, and is not accepted as true.  See Morse, 132 F.3d at 906.

Accordingly, I find that Mr. Blasi has failed to set forth a claim for a violation of his First Amendment rights.  I will grant the defendant's motion to dismiss Count 1.

### 3.   Counts 3, 4, and 5 -- Interference with Mr. Blasi's Right to Raise His Children

In Count 3, Mr. Blasi contends that his sons should not be forced to wear an off-the-court uniform on game days.  This uniform consists of a shirt, tie, slacks, and dress shoes to be worn at school for home basketball days; and a specific green shirt emblazoned with a Pen Argyl logo, and a tie, slacks, and dress shoes to be worn during school and on the bus to and from away games.  See Compl. ¶ 17. He alleges that this rule violates his right to raise his family, and that the dress

code will "stifle free will and free thought" and will "oppress" and "manipulate"
his children.  Id. ¶ 18.  The amended further complaint alleges that Mr. Blasi "does
not want his children to grow up as easily oppressed and manipulated as the
people of Northampton County."  Id.  Moreover, he alleges that this uniform is an
embarrassment to his children because it associates them with the "white losers"
on the team, and as their father, he has a right to protect his sons from such
humiliation.  Id.

In Count 4, Mr. Blasi complains about the School District's policy which
forbids parents from watching and hearing the basketball practices and try-outs.
The policy is called the "closed gym" or "closed practice" policy.  See Compl.¶
20.  Mr. Blasi insists that this policy serves to hide: (1) the incompetence of the
defendant's coaching staff; (2) the harassing and abusing conduct by the coaching
staff toward Mr. Blasi's children; and (3) the racial discrimination conducted and
approved of by the district and its coaching staff against Mr. Blasi's children.  Id. ¶
21.  This policy, he insists, interferes with his constitutional right to raise and
protect his family, and the rights of his "mixed-race children," and his rights as a
citizen in the school district.  Id. ¶ 23.

In Count 5, Mr. Blasi complains that his two sons have been cut from the
basketball team even though they were both taller, strong, and better basketball
players than any of the white student players who made the team.  Mr. Blasi is
concerned that the boys' tennis team will soon implement closed tryouts and
practices which could impede his son Oliver's chances of making the tennis team.

19

It is well-settled by the Supreme Court of the United States that parents have a fundamental liberty interest, which is protected by the Due Process Clause of the Fourteenth Amendment, to make decisions concerning the care, custody, and control of their children.  Troxel v. Granville, 530 U.S. 57, 66 (2000) ("It cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.")  However, the right of parents to make decisions concerning the care, custody, and control of their children is not without limitations.  Prince v. Massachusetts, 321 U.S. 158, 166 (1944) (Parents rights are not "beyond regulation in the public interest."); Gruenke v. Seip, 225 F.3d 290, 304 (3d Cir. 2000) (During this custodial time, in order to maintain order and the proper educational atmosphere, at times, those authorities "may impose standards of conduct that differ than those approved of by some parents.")

The Third Circuit has also recognized that in the public school context, parental rights are not absolute and can be subject to reasonable regulation.  The court noted that "Courts have held that in certain circumstances the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment."  C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 182 (3d Cir. 2005).

Here, the policies of which Mr. Blasi complains in Counts 3, 4, and 5 in no way interfere with Mr. Blasi's right to raise his children.  Those policies are reasonable restrictions on parents and spectators so that the athletic environment is

conducive to good sportsmanship and learning.  During a School District sporting event, the School District has control and custody over the student athletes.  The policies place no restrictions on the ability of Mr. Blasi or of any parent to coach children at home or away from the School District's facilities.  The defendant's coaching staff, however, have that sole responsibility during School District games and practices.

The School District's policies challenged here are reasonable regulations aimed at promoting student civility and to control the athletic and coaching environment.  The School District has the legal right to impose a dress code for student athletes and to hold closed practices for any sport.  Accordingly, I will grant the defendant's motion to dismiss Counts 3, 4, and 5 as meritless.

4.    Count 6 – One Game Suspensions of Both Sons

In Count 6, Mr. Blasi seeks an Order "declaring the one game suspension of Oliver an unconstitutional violation of Plaintiff's First Amendment rights," and "declaring the one day game suspension of Pierce an unconstitutional violation of Plaintiff's First Amendment rights."  See Compl. ¶ 46.  Mr. Blasi explains that on December 18, 2009, his son Oliver refused to put on his "off the court uniform green shirt and tie, and instead just put on his sweat shirt and coat to go on the bus" on the way home from a basketball game.  Id. ¶ 36.  Mr. Blasi insists that there is no requirement that the off the court uniform had to be worn from the game on the long bus ride back to Wind Gap Middle School.  Instead, the "information sheet" states that for away games, the team members have to wear

the off the court uniform "*to* both school and the game." Id. ¶ 37 (emphasis

added). Nevertheless, the School District's coaches "harassed, belittled, and

badgered Oliver three times" to put on his uniform. Id. ¶ 38. Oliver was

suspended from one game for "argumentative behavior and disrespect displayed

on the part of athletes toward coaches." Id. ¶ 40; see also Am.Compl. Exh. B at 6

(School District Athletic Code) ("Argumentative behavior and disrespect

displayed on the part of athletes toward coaches will not be tolerated"). The

Athletic Code advises that a student athlete's first offense results in a one-game

suspension, and the second offense results in dismissal from the team. Oliver was

sanctioned as indicated by the same Athletic Code that he and his father agreed to

uphold by signing on November 19, 2009. See Am.Compl. Exh. A. The

suspension should have come as no surprise to Mr. Blasi or his son.

On December 22, 2010, Mr. Blasi's son "Pierce had a cold and felt bad,"

and did not go to a basketball game over one hour away. Id. ¶ 41. Mr. Blasi

contends that he is not aware of a school requirement that required the students to

see the school nurse, teacher, or school official for permission not to attend an

away game when they felt sick. Id. ¶ 42. Notwithstanding Mr. Blasi's alleged

unawareness of the policy, the School District's Athletic Code addresses the

attendance of athletes at games and practices:

> "Athletes who become ill during the school day must
> report their illness to a school official. In the event
> that a student is determined to be ill the appropriate
> school official will notify the parent(s) and coach(es)
> that the athlete, due to illness, will not be attending an

> after school practice/game.  Absences without
> permission will be considered to be illegal and
> subjected to discipline as stipulated in the unexcused
> absence section of the Pen Argyl Area School District
> Athletic Code."

See Am.Compl. Exh. B at 2 (School District Athletic Code).  The penalties for the

first unexcused absence is a one game suspension.  Id. at 4.  Pierce was sanctioned

as indicated by the same Athletic Code that he and his father agreed to uphold by

signing on November 19, 2009.  See Am.Compl. Exh. A.  Again, his suspension

should have come as no surprise to Mr. Blasi or his son.

Mr. Blasi insists that because there was no legitimate reason or justification

for these suspensions, the defendant must have suspended the boys "in part to

retaliate against Plaintiff for exercising his rights."  See Am.Compl. ¶¶ 44, 45.

This claim is also meritless.

The School District's Athletic Code outlines for the student athlete a series

of expected behaviors geared toward instilling a sense of good sportsmanship,

confidence, and teamwork.  In fact, the philosophy of the Athletic Code states:

> The athletic program of the Pen Argyl Area School
> District is an integral part of the educational
> experience. The development of our athletes and a
> well-organized program are the specific intentions
> of the administration. The school district regards
> the athletic program, along with the academic
> components of the students' daily schedule, as
> essential to a well-rounded education. We expect
> students to commit themselves to maintaining a
> sound, healthy body and developing physical skills
> that permit them to experience the benefits of
> participating in interscholastic sports.

See Am.Compl. Exh. B at 3 (School District Athletic Code).  Mr. Blasi has failed to demonstrate that either the Parental/Spectator Guidelines or the Athletic Code is unconstitutional.  These policies are not vague or overbroad.  Mr. Blasi and both of his sons signed that they had "received and read copies" of the School District's Athletic Code, and that they had "agree[d] to uphold the standards therein for the 2009-2010 School year."  Both students received a suspension for violating separate provisions of the Athletic Code.  The School District was within its rights to sanction the Blasi boys for their violations.  Mr. Blasi has failed to show any retaliation against him by the School District.  Accordingly, I will grant the defendant's motion to dismiss Count 6.

In conclusion, the plaintiff has failed to set forth claims that the School District's Parental/Spectator Guidelines or its Athletic Code are unconstitutional. Mr. Blasi and his two sons were aware of certain behaviors expected by the School District at its supported sporting events and of the consequences for violating those policies which they agreed to uphold.  Rather than retaliation for exercising his First Amendment rights, Mr. Blasi has shown that he and his children violated separate provisions of the regulations found in the Guidelines and the Code, and were sanctioned accordingly.  I will grant the motion to dismiss in its entirety.

An appropriate Order follows.